The **CHATTOOGA CONSERVANCY, Florida Biodiversity Project, Forest Conservation Council, Georgia Forest-Watch, Ouachita Watch League, Sierra Club, Southern Appalachian Biodiversity Project, Wild Alabama, Wild South, and The Wilderness Society, Plaintiffs**

v.

**Robert T. JACOBS, as Regional Forester of the Southern Region of the U.S. Forest Service, and the U.S. Forest Service, Defendants**

No. CIV.A.1:01–CV1976ODE.

United States District Court,
N.D. Georgia,
Atlanta Division.

June 16, 2005.

---

Blaine T. Phillips, Southern Environmental Law Center, Charlottesville, VA, Donald D.J. Stack, Stack & Associates, Atlanta, Douglas A. Ruley, Southern Environmental Law Center, Inc., Asheville, NC, Jonathan Lee Schwartz, Jon L. Schwartz, Attorney at Law, P.C., Atlanta, Eric Eugene Huber, Sierra Club, Boulder, CO, Martin J. Bergoffen, Southern Appalachian Biodiversity Project, Asheville, NC, Ray Vaughan, WildLaw, Montgomery, AL, for The Chattooga Conservancy, Biodiversity Legal Foundation, Florida Biodiversity Project, Forest Conservation Council, Georgia ForestWatch, Ouachita Watch League, Sierra Club, Southern Appalachian Biodiversity Project, Wild Alabama, Wild South, Wilderness Society, Plaintiffs.

Julia B. Anderson, Office of United States Attorney, Northern District of Georgia, Atlanta, Lisa A. Holden, U.S. Department of Justice, Environment & Natural Resources Division, Myesha K. Braden, U.S. Department of Justice, Environment & Natural Resources Division, Pamela S. West, U.S. Department of Justice, Environment & Natural Resources Division, Washington, DC, Robert David Powell, Office of United States Attorney, Northern District of Georgia, Atlanta, for Elizabeth Estill as Regional Forester of the Southern Region of the U.S. Forest Service, United States Forest Service, Robert T. Jacobs as Regional Forester of the Southern Region of the U.S. Forest Service, Defendants.

## ORDER

ORINDA D. EVANS, District Judge.

In this civil case seeking review of agency action under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706, various environmental organizations contend that Robert T. Jacobs, Regional Forester for the Southern Region of the U.S. Forest Service, and the U.S. Forest Service, failed to follow the requirements of the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–4347, and the National Forest Management Act ("NFMA"), 16 U.S.C. §§ 1600–1687, when the Forest Service amended or revised certain Forest Plans and supplemented a Vegetation Management Environmental Impact Statement. Plaintiffs also seek to overturn Defendant Jacobs' decisions approving projects at two locations in the Ouachita National Forest[1]—Wildhorse Creek (in Oklahoma) and Oliver Branch (in Arkansas). This case is before the court on cross motions for summary judgment. For the reasons set forth below, Defendants' motion for summary judgment [# 60] is GRANTED and Plaintiffs' motion for summary judgment [# 52] is DENIED.

### I. *Claims Pertaining to the Ouachita National Forest*

#### A. *Facts*

The following facts are undisputed unless indicated otherwise.

In 1990, Defendants issued a Vegetation Management Environmental Impact Statement ("VMEIS") for the National Forests in the Ozark/Ouachita Mountains region. The 1990 Ozark/Ouachita VMEIS is a voluminous regional planning document and environmental impact statement that discusses comprehensively the impacts and implications of a range of vegetation management methods that may be used under different circumstances to maintain the health of the forests. "Vegetation management" according to the VMEIS "is the skillful care of plants by means other than timber harvest. It is done to help young trees survive and grow, to provide a variety of wildlife habitats, to reduce hazardous fuels, to improve range forage, and to maintain safe and efficient travelways and utility lines." [Admin. Rec. IV, tab 1 (1990 Ozark/Ouachita VMEIS) at p. iii]. The VMEIS discusses five methods to manage vegetation: prescribed fire, mechanical methods (bulldozers, tractors, mowers, etc.), manual methods (i.e. hand held tools such as clippers, axes, or chain saws), biological methods (grazing), and herbicides.

Like all environmental impact statements prepared pursuant to NEPA, the VMEIS includes "mitigation measures" to reduce potential adverse environmental impacts of the five vegetation management methods. *See* 40 C.F.R. §§ 1502.14(f), 1502.16(h). In addition to mitigation measures that are specific to each of the five management methods, the VMEIS also discusses "General Management Requirements and Mitigation Methods" that apply to all management methods. This lawsuit focuses on one of these general requirements or mitigation measures, which appears in the VMEIS under the heading "Site–Specific Analysis." This section requires that projects within the forests be preceded by a site-specific evaluation of the effect of the selected vegetation management methods on threatened, endangered or sensitive plant and animal species, hereinafter "PETS"[2]:

---

1. The Ouachita National Forest is located in U.S. Forest Service Region Eight, also known as the Southern Region. The Southern Region includes Alabama, Arkansas, Florida, Georgia, Kentucky, Louisiana, Mississippi, North Carolina, Oklahoma, Puerto Rico, South Carolina, Tennessee, Texas and Virginia. Its headquarters is in Atlanta, Georgia.

2. "PETS" is an acronym which describes federally protected species, *i.e.,* proposed, endan-

1. General Management Requirements and Mitigation Measures

a. Site–Specific Analysis

The following general requirements and measures apply to all vegetation management methods. Each forest may be more restrictive, but not less.

(1) Projects must have site-specific analysis in compliance with the National Environmental Policy Act (NEPA).

\* \* \* \* \* \*

(2) A biological evaluation of how a project may affect any species Federally listed as threatened, endangered, or proposed, or identified by the Forest Service as sensitive, is done by a biologist as part of the site-specific environmental analysis. This evaluation considers all available inventories of threatened, endangered, proposed, and sensitive species populations and their habitat for the proposed treatment area. When adequate population inventory information is unavailable, it must be collected when the site has high potential for occupancy by a threatened, endangered, proposed, or sensitive species. Appendix D identifies potential adverse effects from vegetation management by species. When adverse effects are projected, mitigation measures specified in appendix D and this chapter are used to prevent them. 1990 Ozark/Ouachita VMEIS at II–40 and II–41.

According to the VMEIS, the purpose of the site-specific analysis and the collection of PETS data is "to ensure that these species are protected when vegetation management projects (including those designed to benefit the species) take place." [1990 Ozark/Ouachita VMEIS at IV–82]. In addition to the general requirement to review and collect information on PETS, the VMEIS also discusses in detail PETS-related concerns that arise from each of the five vegetation management methods. [1990 Ozark/Ouachita VMEIS at IV–82 through IV–84]. The VMEIS describes how different mitigation measures address specific risks posed by different methods. For example, the VMEIS discusses in detail a variety of PETS-related mitigation measures to avoid dangers related to herbicides, since herbicides can prove uniquely risky to sensitive species. [1990 Ozark/Ouachita VMEIS at II–54 through II–61].

Around the same time the 1990 Ozark/Ouachita VMEIS was published, the Forest Service also issued a new Forest Plan for the Ouachita National Forest.[3]

gered, threatened and sensitive species. A proposed species is one "that is proposed in the Federal Register to be listed under . . . the [Endangered Species] Act." 50 C.F.R. § 402.02. An "endangered" species is "Any species that is in danger of extinction throughout all or a significant part of its range...." 16 U.S.C. § 1532(6). Endangered species are designated in the Federal Register.

A "threatened species" is "Any species that is likely to become an endangered species within the foreseeable future throughout all of a significant part of its range." 16 U.S.C. § 1532(20). Said species are designated in the Federal Register.

A "sensitive species" is any "plant [or] animal species identified by a Regional Forester for which population viability is a concern, as evidenced by: significant current or predicted downward trends in population numbers or density; or significant or predicted downward trends in habitat capability that would reduce a species' distribution." *Forest Service Manual,* at § 2670.5(19).

3. NFMA requires the Forest Service to promulgate Forest Plans for all units of the National Forest system. 16 U.S.C. § 1604. Under NFMA, the 1990 Ouachita Forest Plan can last no more than 15 years; within that time a revised Forest Plan must be promulgated as well as a revised EIS. 16 U.S.C. § 1604(f)(5). By the Court's calculation, a new Forest Plan and new EIS for the Ouachita National Forest are now due, and probably have been created since the filing of the parties' briefs.

The 1990 Forest Plan for the Ouachita National Forest was developed in connection with its own Environmental Impact Statement ("EIS").[4] This EIS is different from the VMEIS, which pertains only to vegetation management. The Forest Plan EIS applied only to the Ouachita National Forest, whereas the VMEIS applies to the Ouachita National Forest and two other national forests in the Ozark/Ouachita region.

Amendment 3 to the Ouachita Forest Plan made the Record of Decision ("ROD")[5] for the 1990 Ouachita VMEIS a part of the Ouachita Forest Plan. Amendment 3 explicitly incorporated into the Ouachita Forest Plan the VMEIS language requiring the collection of PETS data for a site-specific project whenever "adequate population inventory information" was not already available.

In *Sierra Club v. Martin,* 168 F.3d 1 (11th Cir.1999), the United States Court of Appeals for the Eleventh Circuit addressed the same PETS language as it appeared in the Forest Plan for the Chattahoochee and Oconee National Forests. *Martin* held that the Forest Service violated the requirements of the Forest Plan (and thereby violated NFMA) by implementing a logging and road construction project in the absence of "adequate population inventory information" on PETS. The Forest Service had admitted that sensitive and endangered species inhabited the project area and that they would be destroyed by the proposed timber sales, but "the Forest Service had no population inventory information and little in the way of population data for thirty-two of the thirty-seven vertebrate PETS species that inhabit the Forest." *Id.* at 4. *Martin* found that because the Forest Service acted contrary to its own Forest Plan in approving the project without "adequate population inventory information", its action in approving the project was arbitrary and capricious.

After *Martin* the Forest Service amended the PETS language in forest plans throughout the Southern Region, including in the 1990 Ouachita Forest Plan. The amendments made it clear that the Forest Service did not always need to collect pre-project population data on every PETS species occurring in a proposed project area. Rather, in some cases the presence of PETS could be assumed in assessing whether particular treatment methods would harm PETS. The amendments also specifically recognized that data collection efforts could be futile in the case of elusive species. The Forest Service stated that "The recent decision by the United States Court of Appeals for the Eleventh Circuit in *Sierra Club v. Martin* illuminated the need to clarify the management direction for conducting biological evaluations on proposed projects. The Eleventh Circuit essentially interpreted the current provision as requiring the Forest Service to have population inventory information on all PETS species occurring, or with a high potential to occur, within the project vicinity. Since the existing [PETS] provision does not clearly state the Forest Service's intent or support its view of. the proper scientific methodology to be followed, the current management direction needs to be clarified." [Amendment 31 Decision Notice, Admin. Rec. IV., tab. 5, at p. 3].

4. The EIS for the 1990 Ouachita Forest Plan does not appear to be in the record.

5. "A record of decision is a concise written rationale by the RFO [Responsible federal official] regarding implementation of a proposed action requiring an environmental impact statement." 7 C.F.R. § 650.4. The ROD must (1) state the decision made, (2) identify all alternatives considered, and (3) state "whether all practicable means to avoid or minimize environmental harm from the alternative selected have been adopted, and if not, why they were not." 40 C.F.R. § 1505.2.

Amendment 31 (August, 2000) to the 1990 Ouachita Forest Plan replaced Amendment 3 with wording that made the acquisition of additional project-related PETS data more clearly discretionary with the Forest Service:

A biological evaluation of whether, and to what extent, a management action could affect any species federally listed as threatened, endangered, or proposed, under the Endangered Species Act (ESA), or designated by the Forest Service as sensitive, is prepared as part of environmental analysis for project-level decision making. The procedures for biological evaluations are found in Forest Service Manual 2670, *Threatened, Endangered, and Sensitive Plants and Animals.*

During the biological process to identify possible effects, existing available information will be used to determine the PETS species known or expected to occur in the vicinity of the proposed project or likely to be affected by the action. The information considered may include data on species/habitat relationships, species range distribution, and population occurrences developed from past field surveys or observations. Existing available information considered will also include the amount, condition, and distribution of suitable habitat.

For some PETS species expected to occur in the vicinity of the project, or likely to be affected by the project, additional field surveys conducted in suitable habitat that is potentially affected by the proposed project are desirable to document the presence or absence of these species. These field surveys would be most appropriate if past field surveys are not available for such areas and if they would provide more definitive information to improve the determination of effects to PETS species.

However, there are some PETS species and situations where information to determine potential effects to PETS species may not require field surveys. For these situations, the PETS species in question would be assumed to occur in the area if suitable habitat is present, and effects to the species would be considered in the effects analysis. These situations occur when:

1.  There is a low likelihood of detecting a particular species; a field survey probably would not find that species and therefore could not provide definitive information for excluding a species being considered for protection.

2.  Established Forest Plan direction or mitigation that effectively protects PETS species expected to occur in suitable habitat in the project vicinity is already in place and is part of the proposed action.

3.  Habitat requirements of a PETS species are well known and a) there is sufficient evidence that the proposed actions would have only short- or long-term beneficial effects or no adverse effects to PETS species or b) any adverse effects of the proposed actions would not be likely [to] cause it to be Federally listed or to suffer reduced viability.

[Am. 31 Dec. Not., Admin. Rec. IV., tab. 5, at p. 2]. Because Amendment 31 was an amendment to the 1990 Ouachita Forest Plan only and not to the 1990 Ozark/Ouachita VMEIS, the original PETS data collection wording remained in the 1990 Ozark/Ouachita VMEIS.

An environmental assessment was prepared to assess the environmental impacts of Amendment 31.[6] [Admin. Rec. IV, tab

6.  An Environmental Assessment, prepared

pursuant to NEPA, is "a concise public docu-

3]. It stated that the "purpose and need" for Amendment 31 were to clarify the Forest Plan's PETS-related requirements following *Martin;* that the amendment would have no significant impact on humans or protected species; and that "This amendment does not diminish the requirement for 'adequate population inventory'" but instead simply "allow[s] the Forest Service to focus on collecting data on those species for which sufficient data are lacking." [Admin. Rec. IV, tab 3, at p. 2–4]. The Forest Service issued a Finding of No Significant Impact ("FONSI") on July 12, 2000, meaning that an environmental impact statement ("EIS") would not be required. [Admin. Rec. IV, tab 5].

On August 22, 2000, Plaintiffs Ouachita Watch League, Sierra Club and other environmental citizens' groups appealed the adoption of Amendment 31. [Admin. Rec. IV, tab 6]. Plaintiffs alleged that Amendment 31 was "a shameless attempt to skirt the holding of *Sierra Club v. Martin.*" Plaintiffs made numerous objections to Amendment 31, including that Amendment 31 was a significant action requiring a full environmental impact statement and that because Amendment 31 was less restrictive as to the PETS data collection language than the 1990 Ozark/Ouachita VMEIS it could not lawfully be adopted absent a change in the 1990 VMEIS. The Deputy Regional Forester rejected Plaintiffs' administrative appeal on November 22, 2000. [Admin. Rec. IV, tab 7].

Plaintiffs filed their complaint in this case on July 26, 2001. Plaintiffs' primary argument was that Amendment 31 impermissibly diluted the 1990 PETS data collection requirement because it was inconsistent with the PETS data collection language of the 1990 Ozark/Oua-

chita VMEIS which had not changed. Plaintiffs also argued that Amendment 31 should have been accompanied by an environmental impact statement, not merely by an environmental assessment.

In August of 2001, the Forest Service published a notice of its intent to supplement the 1990 Ozark/Ouachita VMEIS so as to change the wording of the PETS data collection language. It also gave Notice of its intent to amend the Forest Service Manual for the Southern Region to effect a similar revision. The amendment to the Forest Service Manual was effective March 7, 2002. It retained the requirement of a pre-project PETS inventory only where: 1) Vegetation management techniques for a particular project would have adverse effects on PETS occupants known or assumed to be present, 2) further information on the number and location of PETS would improve the effectiveness of mitigation efforts to reduce adverse effects, or allow better assessment of effect on the viability of the population, 3) no current site-specific inventory of PETS occupants existed, and 4) feasible and effective inventory methods for the PETS assumed to be present existed. [Supplement to Forest Service Manual, Admin. Rec. IV, tab 8].

The Forest Service issued a Supplement to the 1990 Ozark/Ouachita VMEIS on October 25, 2002. [Admin. Rec. IV, tab 10]. This supplement had an effective date of November 15, 2002, and included the following new PETS language:

A Biological Evaluation of how a project may affect any species federally listed as threatened, endangered or proposed, or identified by the Forest Service as sensitive *shall be* done as part of the site-

ment" which "[b]riefly provide[s] sufficient evidence and analysis for determining whether to prepare an environmental impact statement or [to issue] a finding of no significant

impact." 40 C.F.R. § 1508.9(a)(1); *see also Hill v. Boy,* 144 F.3d 1446, 1450 (11th Cir. 1998).

specific environmental analysis. This evaluation considers available *information on* threatened, endangered, proposed, and sensitive species populations and their habitat for the proposed treatment area.

*Id.* at p. 4 (emphasis in original). The effect of this supplement was to delete from the 1990 Ozark/Ouachita VMEIS any mention of PETS "inventory" or further collection of PETS data and to state that "available [PETS] information" would be considered to determine the effect of a project on PETS.

At the same time that the Supplement to the 1990 Ozark/Ouachita VMEIS was adopted, Amendment 31 to the Ouachita Forest Plan was replaced with Amendment 35 (October, 2002). Whereas Amendment 31 had emphasized guidelines for collecting new PETS data while also making the decision to collect new data more clearly discretionary, Amendment 35 simply stated:

> A biological evaluation of how a project may affect any species Federally listed as threatened, endangered or proposed, or identified by the Forest Service as sensitive shall be done as part of the site-specific environmental analysis. This evaluation considers available information and sensitive species populations and their habitat for the proposed treatment area.

[Admin. Rec. IV, tab 9].

On December 20, 2002 Plaintiffs filed an administrative appeal of Defendants' approval of the Supplement to the VMEIS. Plaintiffs complained that "these exceedingly short documents contain no serious attempt to explain the proposed plan amendments, or to analyze the environmental impacts of this proposal, or to consider alternatives to the proposal." [Ad-

min. Rec. IV, tab 16]. Plaintiffs objected to the supplement on grounds that it: (1) failed to state its purpose and need, as required by NEPA; (2) failed to consider the connected action of amending the Forest Service Manual; (3) considered an inadequate range of alternatives; (4) provided a deficient analysis of environmental impacts; and (5) had a predetermined outcome.

The Forest Service rejected Plaintiffs' appeal on July 10, 2003. [Admin. Rec. IV, tab 19]. Plaintiffs then amended their complaint in this case to add the claims which Plaintiffs had raised in their administrative appeal pertaining to the 2002 Supplement to the 1990 Ozark/Ouachita VMEIS. The 2003 amended complaint also challenged the approvals of specific projects in the Ouachita National Forest—the Wildhorse Creek Project and the Oliver Branch Project—which were approved after Amendment 31 to the Forest Plan had been adopted but before Amendment 35 or the 2002 Supplement to the 1990 VMEIS became effective.

In December, 2003, Plaintiffs moved [# 33] for a temporary restraining order to enjoin the projects at Wildhorse Creek and Oliver Branch. The court denied this motion in May, 2004, finding that Plaintiffs had failed to demonstrate a substantial likelihood of success on the merits. The two projects and their administrative review history are described as follows:

*Wildhorse Creek Project*

The Wildhorse Creek Project (LeFlore County, Oklahoma) was announced in January of 2002. [Admin. Rec. I, p. 34].[7] The project includes 2,323 acres of preparatory thinning for uneven age timber management, 70 acres of single tree selec-

---

7. Apparently, it had been previously announced in 2000 but was delayed. The pro-

cess started again in January 2002.

tion cutting, 148 acres of group selection/thinning, 218 acres of site preparation burn and chain saw felling, 404 acres of wildlife stand improvement/release and 4,883 acres of wildlife prescribed burn. In July 2002, the Forest Service issued an environmental assessment ("EA") and a biological evaluation ("BE") of the Wildhorse Creek Project [Admin. Rec. I, p. 92 and p. 152].[8] The Wildhorse Creek Project is in the Oklahoma Ranger District, Choctaw Unit.

The Wildhorse Creek BE listed each of the 77 proposed, endangered, threatened and sensitive species (the sensitive species were drawn from the Regional Forester's sensitive species list) "known to occur within or near the Oklahoma Ranger District". [Wildhorse Creek BE, Admin. Rec. I., at p. 153]. The BE listed whether each species was known to exist "Within the Project Area," or "Not Within but Suitable Habitat Present." No species were listed as "Within the Project Area," but twelve species were listed in the second "Not Within but Suitable Habitat Present" category. In other words, there was a possibility that the twelve species could be present. These PETS species were the American Burying Beetle, Indiana Bat, Diana Fritillary (an insect/butterfly), Bachman's Sparrow, Rich Mountain Slit–Mouth Snail, Rich Mountain Salamander, Eastern Small-footed Bat,

Ouachita Leadplant, Ozark Chinquapin, Ouachita Goldenrod, Ozark Spiderwort, and Ozark Least Trillium.[9]

For each of these twelve species the BE contained a discussion of their environmental baseline, noting the type of environment preferred by each of them. The baseline evaluation was based on a variety of existing data and information. For example, the BE discussed a range of caves in which the Indiana Bat was known to hibernate during winter months. Surveys found 7 bats there in 1991, one in 1993 and four in 1995. Winter surveys in 1997, 1999 and 2000 located no bats. Summer surveys in 1995 and 1997 failed to reveal any bats. These caves are not in the project area, but are in the Choctaw Unit. The same kinds of existing data were reviewed regarding each of the twelve species. For many of the twelve species the BE noted past surveys in which the surveyor had been unable to find any samples of the particular species.

The Wildhorse Creek EA relied on the BE and found that no PETS species were known to occur within the proposed project area. Moreover, even if the American Burying Beetle or the Indiana Bat were present in the proposed project area, the Wildhorse Project would have no adverse effect on them. The EA concluded that if any of the sensitive species were present

---

**8.** The biological evaluation was required by the 1990 Ozark/Ouachita VMEIS as well as by the Ouachita Forest Plan, both of which require the Forest Service to "perform biological evaluation on all projects to determine possible effects on threatened or endangered species, or on species proposed for such listing, or on sensitive species." [1990 Ozark/Ouachita VMEIS, at II–40; Ouachita Forest Plan, Admin. Rec. III, at IV–13]. The Endangered Species Act also requires that "[e]ach Federal agency shall ... insure that any action authorized, funded, or carried out by such agency ... is not likely to jeopardize the continued existence of any endangered

species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary, ... to be critical." 16 U.S.C. § 1536(a)(2). Because the Forest Plan and the Endangered Species Act both require an evaluation of the effect of the project as a whole on protected species, the biological evaluation is not limited to the effect of proposed "vegetation management methods".

**9.** The American Burying Beetle and the Indiana bat are endangered species. The remaining species are sensitive species.

in the proposed project area, the project "may impact individuals but is not likely to cause a trend toward federal listing or a loss of viability". [Admin. Rec. I, p. 135].

In a Decision Notice and Finding of No Significant Impact [10] made on July 26, 2002, the District Ranger for the Oklahoma Ranger District determined that the Wildhorse Creek Project should proceed. He determined that the project would have no significant impact on the quality of the human environment and that the project would not adversely affect protected species.

On September 9, 2002, the Ouachita Watch League appealed the District Ranger's decision on a number of grounds. [Admin. Rec. I, p. 272]. The appeal did not complain about the illegality of Amendment 31.[11] The Ouachita Watch League contended that the EA failed to provide baseline sensitive species numbers as required by the *Martin* decision. [Admin. Rec. I, p. 274]. Regarding the claimed inadequacy of data for PETS and so-called "MIS" species,[12] the appeal stated:

> The Project Activities are likely to jeopardize the viability of species that find optimal habitat in interior forests on the Ouachita National Forest.... These include threatened, endangered, and sensitive species, as well as management indicator species. These species include the gray squirrel, Indiana bat, pine warbler, worm-eating warbler red-eyed vireo, Acadian flycatcher, ovenbird, pileated woodpecker, as well as plant species. Of those bird species listed, several have exhibited statistically significant population declines since 1996, including the Acadian flycatcher, ovenbird, loggerhead strike [sic], and pileated woodpecker.
>
> For many of these species, the Forest Service has no up-to-date population data describing population numbers, locations or trends nor monitoring data on which the agency can rely to determine that the actions proposed in the context of Project activities will maintain numbers and distribution of these species sufficient for issuing long term viability.

[Admin. Rec. I, p. 279].

The Watch League appeal did not mention any of the twelve PETS species which the District Ranger had found were possible residents of the Wildhorse project site, with the sole exception of the Indiana bat.

The Regional Forester affirmed the District Ranger's decision that the Wildhorse Creek Project should proceed. [Admin. Rec. I, p. 300]. He found that the project

---

10. A "decision notice" is a concise written record of a Forest Service official's decision on a particular matter based upon an environmental assessment and a finding of no significant impact. 36 C.F.R. § 215.2. A "finding of no significant impact" or "FONSI" is the determination that a full environmental impact statement is not required. 40 C.F.R. § 1501.4; *Dep't of Transportation v. Public Citizen*, 541 U.S. 752, 124 S.Ct. 2204, 2209–10, 159 L.Ed.2d 60 (2004).

11. The appeal did complain of the illegality of Amendment 33, but not of Amendment 31. However, the claim regarding Amendment 33 has not been asserted in the instant lawsuit.

12. In conducting forest planning the Forest Service is required to "estimate the effects of each [management] alternative on fish and wildlife" species that are selected "because their population changes are believed to indicate the effects of management activities." 36 C.F.R. § 219.19(a)(1). These species are known as "Management Indicator Species" ("MIS") because they act as indicators for the relative success of forest management.

In January 2005, the NFMA regulations found at 36 C.F.R. § 219 pertaining to MIS were repealed. *See* 70 F.R. 1023–1061 (Jan. 5, 2005). When citing 36 C.F.R. § 219, unless otherwise stated, the Court refers to the 1982 regulations that were in force until January, 2005, and therefore at the time the subject projects were approved.

would have no significant impact on the human environment; hence, no environmental impact statement was required. He also found that the project methods would not adversely affect protected species. He noted that the biological evaluation for the project reviewed "Baseline, site-specific survey information for two federally listed species and ten sensitive species in the project area" ( i.e., PETS), citing pages 7–29 of the BE. [Admin. Rec. I, p. 309]. The appeal decision concluded that proper procedures had been followed.

At the time the Regional Forester affirmed the Wildhorse Creek Project, the original 1990 Ozark/Ouachita VMEIS and Amendment 31 to the Ouachita Forest Plan were in force; neither the 2002 Supplement to the VMEIS nor Amendment 35 to the Ouachita Forest Plan were in effect.

*Oliver Branch Project*

The Oliver Branch Project (Scott County, Arkansas) was announced in October, 2001. [Admin. Rec. II, p. 115]. This project includes timber harvest from approximately 362 acres of shelter wood, 2,099 acres of thinning, construction of 16 wildlife ponds, and prescribed burning on 5,329 acres. In July 2002, the Forest Service issued an environmental assessment ("EA") and a biological evaluation ("BE") for the project. The Oliver Branch project is located in the Poteau Ranger District.

The Oliver Branch BE listed the PETS species known to exist in the Ouachita Forest. The Forest Service concluded that fourteen of them were or might be present within the project area, either because they were known to be present or because the project area had suitable habitat for them. [Oliver Branch BE, Admin. Rec. II, at p. 470]. The fourteen specified included three endangered species (Red Cockaded Woodpecker, Indiana Bat, American Burying Beetle), one threatened species (Bald Eagle), and ten sensitive species (Bachman's Sparrow, Diana Fritillary,

Kiamichi Shiner, Louisiana Fatmucket, Southern hickorynut, Ouachita Creekshell, Ouachita False Indigo, Narrowleaf Ironweed, Sand Grape, and Waterfalls' Sedge).

The BE discussed existing data and known populations of each of these fourteen species, noting the type of environment preferred by each of them. For example, after describing the Red Cockaded Woodpecker's preferred habitat, the BE noted that the Poteau Ranger District has prepared annually since 1990 a table summarizing numbers of adult woodpeckers and the nesting habits of the woodpecker. The BE also discussed basic biological and population data for the woodpecker concerning its population in the broader region (the Ouachita National Forest and nearby forested areas). The Oliver Branch BE noted numerous situations where surveys had been unable to find any samples of certain other sensitive or threatened species.

The District Ranger for the Poteau Ranger District issued a Decision Notice on July 18, 2002, finding that the Oliver Branch Project would have no significant impact on the quality of the human environment. [Admin. Rec. II, p. 397]. He also found, quoting the findings of the BE, that the project was not likely to adversely affect the Red Cockaded Woodpecker. He noted that the American Burying Beetle was not found in the project area, although it had been in found low numbers in neighboring counties; in any event, the proposed project would not adversely affect the beetle if it was present. Similarly, he found that the Bald Eagle was not known to exist within the project area, although a Bald Eagle nest had been found on Lake Hinkle (apparently a nearby lake) in 2002; further, the Bald Eagle would not be adversely affected by the project activities. He found that the Indiana Bat had never been located in the proposed project area and that "summer surveys in the Ouachita

have failed to locate any individuals" though the bats appeared to be breeding in the Ozark Mountains in Arkansas; thus, he classified the Indiana Bat as a possible resident of the project area but found that the project activities would not harm the bat if it was present. He found that the project would likely have a beneficial effect on the Bachman's Sparrow and the Diana Fritillary, which were known to be located in the project area.

On August 29, 2002, an administrative appeal was filed by Plaintiff Forest Conservation Council and Jerry Williams. [Admin. Rec. II, p. 429]. The appeal made a number of claims, but did not mention the illegality of Amendment 31. The appeal specified in relevant part:

> The Project Activities are likely to jeopardize the viability of species that find optimal habitat in interior forests on the Ouachita National Forest, forests with well-developed structures, and forests naturally disturbed. These species include the gray squirrel, Indiana bat, pine warbler, worm-eating warbler red-eyed vireo, Acadian flycatcher, ovenbird, pileated woodpecker, as well as plant species. Of those bird species listed, several have exhibited statistically significant population declines since 1996, including the Acadian flycatcher, ovenbird, loggerhead strike [sic], and pileated woodpecker.

> For many of these species, the Forest Service has no up-to-date population data describing population numbers, locations, and trends, nor monitoring data on which the agency can rely to determine that the actions proposed in the context of Project Activities will maintain numbers and distribution of these species sufficient for insuring long term viability.

[Admin. Rec. II, p. 436].

The Regional Forester issued his written decision in the appeal on October 15,

2002, determining that the project should proceed. [Admin. Rec. II, p. 459]. At this time Amendment 31 to the Ouachita Forest Plan and the 1990 Ozark/Ouachita VMEIS were still in effect; the 2002 Supplement to the 1990 VMEIS and Amendment 35 to the Ouachita Forest Plan still were not operative. The Regional Forester quoted the BE and determined that there was sufficient "base line, site specific, survey information for PETS species in the project area". He found that the District Ranger had correctly determined that project activities would not adversely affect protected species.

### B. *Legal Overview*

The provisions of two major environmental statutes, the National Forest Management Act ("NFMA"), 16 U.S.C. §§ 1600–1687, and the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–4347, and their accompanying regulations are involved in this case. Neither statute provides a private cause of action to plaintiffs. The Court's jurisdiction arises solely under the Administrative Procedure Act, 5 U.S.C. § 701–706, which authorizes federal district court review of final agency actions upon completion of any required administrative review. This Court's role is to determine whether any of the challenged actions by the Forest Service were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). The basis for Plaintiffs' claims that these actions were arbitrary and capricious is their contention that they were inconsistent with the requirements of NEPA and NFMA.

NFMA details the manner in which the Agriculture Department oversees and manages the National Forest System. The requirement that the Forest Service develop and comply with Forest Plans in

each national forest derives from NFMA. 16 U.S.C. § 1604(a); 36 CFR § 200.1(c)(2). NEPA requires that all federal agencies review the environmental ramifications of "major federal actions" which will have a "significant effect on the human environment" before they are implemented; the requirement to develop environmental impact statements derives from NEPA. 42 U.S.C. § 4332.

NFMA requires the Forest Service to develop a Land Resources Management Plan (commonly known as a Forest Plan) for each national forest. 16 U.S.C. § 1604(a). The Forest Service is then required to ensure that the forest is managed in compliance with the Forest Plan. *See* 36 C.F.R. § 219.10(e).[13] Specific projects, such as the Oliver Branch and Wildhorse Creek projects, must be analyzed by the Forest Service; the analysis must show that each project is consistent with the plan. *See* 16 U.S.C. § 1604(i); 36 C.F.R. § 219.10(e).

While NFMA imposes substantive duties upon the Forest Service—namely, to comply with the terms of the relevant Forest Plan when taking action within a given forest—NEPA "imposes procedural but not substantive requirements" on federal agencies. *Fund for Animals, Inc. v. Rice*, 85 F.3d 535, 546 (11th Cir.1996). "NEPA does not work by mandating that agencies achieve particular substantive environmental results," *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 371, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989), but rather by requiring that agencies study and consider the environmental consequences of proposed actions before the actions are taken.

NEPA requires that federal agencies prepare an environmental impact statement as part of any "proposals for legislation and other major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(c); *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 124 S.Ct. 2373, 159 L.Ed.2d 137 (2004). Among other things, the EIS must discuss the environmental impact of the proposed action, including unavoidable adverse effects of the proposal, and must consider alternatives to the proposed action. 42 U.S.C. § 4332(2)(c).

In order to determine whether a proposed action is a "major" one which "significantly" affects the human environment, agencies may first produce a much shorter document, known as an environmental assessment. 40 C.F.R. § 1501.4. "The purpose of an EA is to '[b]riefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact.'" *Hill v. Boy*, 144 F.3d 1446, 1450 (11th Cir.1998) (*quoting* 40 C.F.R. § 1508.9(a)(1)). A "finding of no significant impact" or "FONSI" is the determination that an EIS is not required.

In reviewing the government's NEPA compliance, a court's duty is not to guarantee any particular outcome, but rather "to ensure that the agency took a 'hard look' at the environmental consequences of the proposed action." *Sierra Club v. U.S. Army Corps of Engineers*, 295 F.3d 1209, 1216 (11th Cir.2002). To satisfy its 'hard look' duty, "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) (internal quotation omitted).

**13.** The relevant Forest Service regulations were recently revised, and 36 C.F.R. § 219.10(e) was deleted. *See* 70 F.R. 1023– 1061 (Jan. 5, 2005). However, the overall framework requiring development of a forest plan remains in place.

As stated above, the Administrative Procedure Act ("APA") provides the framework for review for all of Plaintiffs' claims. The APA's standard of review is highly deferential: agency action must be affirmed unless that action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). To assess whether the agency acted arbitrarily and capriciously, "the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). "Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." *Id.*

### C. *Plaintiffs' Claims*

Plaintiffs' Amended Complaint contains seven claims for relief. Count I alleges that the PETS data collection requirement in the 1990 Ozark/Ouachita VMEIS is mandatory and that Defendants violated the Administrative Procedure Act by allegedly ignoring this requirement.

Count II alleges that Defendants violated NEPA and the APA because they failed to supplement the 1990 Ozark/Ouachita VMEIS *before,* rather than after, amending the 1990 Ouachita Forest Plan to delete Amendment 3 and add Amendment 31. Count II also alleges that the environmental assessment for Amendment 31 was deficient because it failed to address the inconsistency between Amendment 31 and the 1990 VMEIS.

Count III alleges that Defendants violated NEPA and NFMA by failing to prepare an environmental impact statement, as opposed to just an environmental assessment, for Amendment 31 to the Ouachita Forest Plan.

Count IV alleges that Defendants violated NEPA by adopting revised Forest Plans for the National Forests of Florida and one National Forest in Louisiana without mentioning the proposed modification of the PETS requirements in the draft environmental impact statements for these revised forest plans.

Count V alleges that Defendants violated NEPA and the APA by preparing environmental assessments for forest plan amendments in such a way that public participation was excluded.

Count VI alleges that Defendants violated NEPA and the APA because the process by which the Supplement to the 1990 VMEIS was adopted was arbitrary and capricious in that the Supplement failed to state its purpose; failed to address related actions; considered an inadequate range of alternatives; and generally failed to take a "hard look" at foreseeable environmental impacts.

Count VII alleges the Wildhorse Creek and Oliver Branch projects were unlawful because they were approved pursuant to Amendment 31 of the Ouachita Forest Plan which was unlawful for reasons asserted in prior counts of the complaint, and also because adequate PETS data and Management Indicator Species (MIS)[14] data for the Forest and for the two project areas allegedly was lacking.

### D. *Exhaustion of Administrative Remedies*

■ In order to invoke the APA to challenge agency action, a litigant must first

---

**14.** See note 12, *supra.* Plaintiffs' claims related to Management Indicator Species are addressed in greater detail in the companion case *Forest Conservation Council et. al. v. Jacobs et. al.*

exhaust any administrative remedies made explicitly mandatory under the relevant substantive law. 5 U.S.C. § 704; *Darby v. Cisneros,* 509 U.S. 137, 154, 113 S.Ct. 2539, 125 L.Ed.2d 113 (1993). The exhaustion requirement promotes judicial efficiency by allowing an agency to exercise its discretion and apply its expertise prior to judicial involvement. *McKart v. United States,* 395 U.S. 185, 194, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969).

The U.S.D.A. Reorganization Act of 1994, section 212(e) provides that "a person shall exhaust all administrative appeal procedures established by the Secretary or required by law before the person may bring an action in a court of competent jurisdiction against (1) the Secretary; (2) the Department; or (3) an agency, office, officer, or employee of the Department." 7 U.S.C. § 6912(e).[15] Because the Forest Service is a division of the Agriculture Department, Plaintiffs were required to exhaust administrative remedies prior to challenging the Forest Service in court. Thus Congress has placed an explicit statutory exhaustion requirement on challenges to Forest Service activities, including lawsuits alleging that a Forest Plan was adopted in violation of NEPA. *See, e.g., Kleissler v. U.S. Forest Service,* 183 F.3d 196 (3rd Cir.1999).

Based on a review of Plaintiffs' administrative filings, the Court concludes that administrative remedies have been exhausted as to the claims in these counts: I, II, III, VI and a portion of Count VII. The status of Count IV, which deals only with the National Forests in Florida and a National Forest in Louisiana, is discussed separately in Part II below.

■ Defendants are correct that Plaintiffs are barred from raising the claims appearing in Count V because they failed to exhaust remedies relevant to those claims. Count V alleges that "the public was left out of the [Amendment 31] decision-making process in violation of NEPA." [Pls.' Compl., ¶ 53]. During the administrative appeals process, Plaintiffs made no objection even resembling a criticism of the public participation process for Amendment 31. In fact, Plaintiffs' appeal of Amendment 31 even asserts that "[n]umerous parties made public comment to the Forest Service in opposition" to the proposed amendment. [Admin. Rec. IV, tab 6, p. 5]. As such, Count V will not be considered on the merits.

While the Court agrees with Plaintiffs that the claims pertaining to Amendment 31 contained in Counts II and III have been exhausted administratively, this determination deserves separate comment.

■ Defendants argue that Plaintiffs cannot challenge Amendment 31 because Plaintiffs failed to object to Amendment 31 during the administrative appeals of the Oliver Branch and Wildhorse Creek projects. Although Defendants are correct that Plaintiffs did not mention Amendment 31 during their project-specific appeals, Amendment 31's adoption included its own administrative appeals process, which took place separately from and prior to Plaintiffs' appeals of the two projects. At that time, Plaintiffs did appeal the adoption of Amendment 31, raising objections nearly identical to Counts II and III of their current complaint, i.e. that Amendment 31 required an environmental impact statement and that the PETS language of Amendment 31 contradicted the PETS language of the 1990 Ozark/Ouachita VMEIS.

---

**15.** 36 C.F.R. § 215.20 provides that "unless waived in a specific case, it is the position of the Department of Agriculture that any filing for Federal judicial review of a decision subject to review under this part is premature and inappropriate unless the plaintiff has first sought to invoke and exhaust the procedures available under this part."

■ Defendants assert without further discussion that Plaintiffs' timely appeal of Amendment 31 "does not support a finding that Plaintiffs exhausted their administrative remedies." [Defs.' Mot. for Summ. J., at p. 35]. With respect to Counts II and III, the Court disagrees. The purpose of exhaustion doctrine is to ensure that the agency has the opportunity to address objections and correct errors prior to judicial involvement. *McKart v. United States*, 395 U.S. 185, 194, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969). The fact that Plaintiffs made their objections prior to and apart from their appeals of the Oliver Branch and Wildhorse Creek projects is of no import. The exhaustion doctrine does not require Plaintiffs to raise repeated and futile appeals already rejected by the agency. *McKart*, 395 U.S. at 200, 89 S.Ct. 1657.

■ With respect to Count VII, the Court finds that Plaintiffs' species-specific MIS and PETS claims are preserved only as to the species named in the administrative appeals for the two projects. Because only two of the species were PETS or MIS for the Ouachita National Forest in the relevant time frame, as a practical matter this means that only those two—Indiana bat (PETS) and the Pileated Woodpecker (MIS)—will remain for consideration on the merits.

As noted above, the purpose of the exhaustion doctrine is to ensure that the agency has the opportunity to address objections and correct errors prior to judicial involvement. *McKart v. United States*, 395 U.S. 185, 194, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969). Given that there are over one hundred MIS and PETS species in the Ouachita National Forest, Plaintiffs' general administrative objection to a lack of sufficient data or monitoring information cannot suffice to put the agency on notice about specific objections to the Forest Service's data on species not named.

Instead, Plaintiffs' objections seem to have functioned more as a place marker so that Plaintiff might later look for data deficiencies to challenge in court.

"[A]dministrative proceedings should not be a game or a forum to engage in unjustified obstructionism by making cryptic and obscure reference to matters that 'ought to be' considered and then, after failing to do more to bring the matter to the agency's attention, seeking to have that agency determination set aside in Court." *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 553, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978).

### E. *Ripeness*

Before proceeding to analyze Plaintiffs' claims, the Court must also consider the issue of whether each claim is ripe for adjudication. In *Ohio Forestry Association v. Sierra Club*, 523 U.S. 726, 118 S.Ct. 1665, 140 L.Ed.2d 921 (1998), the Supreme Court held that because forest plans are broad, programmatic documents which represent "tools for agency planning and management", an attack on a Forest Plan is not ripe for review until it is presented in the context of a specific proposed project wherein the end product of the plan is presented in a concrete way. Because NEPA, unlike NFMA, "simply guarantees a particular procedure, not a particular result", the Court stated *in dicta* that "a person with standing who is injured by a failure to comply with the NEPA procedure may complain of that failure at the time the failure takes place, for the claim can never get riper." *Id.* at 737, 118 S.Ct. 1665.

While the Supreme Court's statement concerning a failure to comply with "the NEPA procedure" is straightforward, it is not self-explanatory. The Court may have been referring only to a failure to prepare

an environmental impact statement (or environmental assessment). On the other hand, the Court may have been referring to other, broader NEPA claims such as the claimed failure of the environmental impact statement to take a "hard look" at the environmental consequences of an issue before deciding it. This latter type of challenge is close to being substantive; the former are not.

In this case, some of Plaintiffs' claims are clearly ripe for review because they are tied to the Wildhorse Creek and Oliver Branch projects which now are before the Court for review. It does not matter whether these claims are classified as substantive or procedural. This includes the claims in Counts I, II, III and VII.[16]

■ Upon consideration the Court finds that Plaintiffs' NEPA claim in Count VI is not ripe for review. It is not tied to any specific project and is as much substantive as it is procedural in nature. In Count VI, Plaintiffs contend that Defendants violated NEPA and APA because the process of adopting the 2002 Supplement to the 1990 Ozark/Ouachita VMEIS was arbitrary and capricious, in that the Supplement failed to state its purpose; failed to address related actions; considered an inadequate range of alternatives; and generally failed to take a "hard look" at the foreseeable environmental impacts of Amendment 35 and the Supplement itself.

While it would not be difficult to determine whether the Supplement properly stated its purpose and properly addressed any related actions, the question of whether the Supplement took a "hard look" at foreseeable environmental impacts is much more complicated because the substantive

and procedural aspects of this question are inextricably intertwined.

In this case, the 1990 Ozark/Ouachita VMEIS is a combination document. It is both a regional planning guide for vegetation management and it is an environmental impact statement which evaluates the methods adopted in the plan.[17] Similarly, the 2002 Supplement to the VMEIS is both substantive and procedural. The Supplement modifies certain substantive language in the 1990 VMEIS pertaining to a "mitigation method". It also evaluates the significance of this change and determines that it is not significant. Amendment 35 to the Ouachita Forest Plan, which is attached to the 2002 Supplement to the VMEIS, contains the identical substantive change in the language of the Forest Plan. Determining whether the 2002 Supplement takes a "hard look" at the environmental effects of Amendment 35 is impossible without envisioning actual potential applications of Amendment 35. Any analysis the Court might do at this time would necessarily be hypothetical and conjectural to the degree that the Court would only be guessing at how this change might relate to a specific project. In addition, the Court has no evidence that any planned project relies on Amendment 35 or the 2002 Supplement to the VMEIS. Finally, it is likely that the Forest Service has just enacted a new Ouachita Forest Plan and an accompanying environmental impact statement, which might or might not have an impact on the vegetation management techniques addressed in the 1990 VMEIS. For all these reasons, the Court holds that Plaintiffs' challenge to the 2002 Supplement to the VMEIS is not ripe for

16. Claims in Count IV which pertain to forests other than the Ouachita are addressed in the sections of this Order pertaining to those other forests. Count V is no longer before the Court because of failure to exhaust administrative remedies.

17. Apparently there is no separate Vegetation Management Plan. If there is, it is not in the record.

adjudication at this time, but remains too hypothetical and conjectural. *See also Lujan v. National Wildlife Federation*, 497 U.S. 871, 891, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990); *Wilderness Society v. Alcock*, 83 F.3d at 386 (11th Cir.1996). Therefore, this claim is dismissed without prejudice and will not be addressed on the merits in this order.

### F. *Merits Analysis of Plaintiffs' Claims*

Counts I, II, III and VII will be analyzed on the merits.

#### 1. *Count I*

In Count I Plaintiffs contend that Defendants' failure to maintain appropriate population inventory data for PETS in the Forest violated the Administrative Procedure Act. "As a procedural statute, the APA does not expand the substantive duties of a federal agency, but merely provides the framework for judicial review of agency action. Accordingly, there is no right to sue for a violation of the APA in the absence of a relevant statute whose violation forms the legal basis for the complaint." *Sierra Club v. Martin*, 110 F.3d 1551, 1555 (11th Cir.1997)(internal citations omitted). Count I mentions only the APA and does not specifically mention NFMA or NEPA as a basis for relief. As such, Count I must be dismissed for failure to state a claim. Nonetheless, the Court will consider these claims as part of its analysis of Count VII.

#### 2. *Count III*

Count III of Plaintiffs' complaint contends that because Amendment 31 was a "significant" amendment to the 1990 Ouachita Forest Plan, both NFMA and NEPA required the Forest Service to complete an environmental impact statement evaluating its potential impact, rather than just an environmental assessment.

NFMA grants the Forest Service wide discretion to amend a Forest Plan. 16 U.S.C. § 1604(f)(4). The regulations stipulate that "the Forest Supervisor shall determine whether a proposed amendment would result in a significant change in the plan." 36 C.F.R. 219.10(f). If the amendment is "significant", the Forest Service must undertake the same procedure required to adopt a Forest Plan, including completion of an environmental impact statement. *Id.* Count III alleges that the Forest Service arbitrarily failed to explain the determination that Amendment 31 was insignificant and that the conclusion that no EIS was required was arbitrary and capricious.

Plaintiffs' initial contention that the Forest Service failed to address whether Amendment 31 was "significant" is incorrect. The Forest Service implicitly considered that question and concluded that the amendment was not significant. The Amendment 31 environmental assessment acknowledged that under the new PETS language, the Forest Service "would make greater use of existing data on species occurrences, habitat conditions, and species/habitat relationships in determining the level of surveys required." [Amendment 31 EA, Admin. Rec. IV, tab 3, p. 8] However, it also explained that this constituted nothing more than a clarification of the Forest Service's PETS duties. *See* [Amendment 31 EA, Admin. Rec. IV, tab 3, p. 4] ("This amendment does not diminish the requirement for 'adequate population inventory'. The proposed amendment would allow the Forest Service to focus on collecting data on those species for which sufficient data are lacking."); [Amendment 31 EA, Admin. Rec. IV, tab 3, p. 14] ("This amendment...will not change any management prescriptions or areas contained in the Forest Plan"). The fact that the EA did not include an explicit state-

ment that the amendment was insignificant under NFMA is unimportant.

The crux of Plaintiffs' challenge to the lack of an environmental impact statement for Amendment 31 is that Amendment 31 represented far more than a mere "clarification" of the Forest Service's PETS duties. If Amendment 31 was a significant change, the Forest Service was required by NFMA to develop a full environmental impact statement prior to approving the amendment. 36 C.F.R. 219.10(f). In addition, if the amendment would have "a significant impact on the human environment" NEPA also required that an environment impact statement be prepared. 42 U.S.C. § 4332(2)(c).

The Court agrees with Defendants that Amendment 31 was not a significant amendment to the 1990 Ouachita Forest Plan. Therefore, under NFMA no environmental impact statement was needed.

To determine whether Amendment 31 was a significant change, it is necessary to define the point of beginning for the analysis. The Court's analysis begins with determining the meaning of the 1990 Ouachita Forest Plan's requirement (in Amendment 3) of "adequate population inventory information" on PETS occurring within a project site. The Eleventh Circuit in *Martin* applied this precise phrase in a case involving the Chattahoochee–Oconee Forest Plan, but did not interpret it. The Court of Appeals found that because "population inventory information" on PETS was so entirely lacking, the proposed projects in the Forest could not proceed. This court interprets *Martin* as saying, in effect, "Regardless of precisely what the phrase 'adequate population inventory information' means, the PETS data is so wholly lacking that it is inadequate under any interpretation." Therefore, this Court is free to interpret the "adequate population inventory information" phrase in the 1990 Ouachita Forest

Plan (more specifically, in Amendment 3 to the Plan).

The key words "adequate", "inventory", and "information" are all important to the meaning of the phrase. "Adequate" implies that what is sufficient in one case might not be in another. Also, with respect to the word "adequate", the question must be asked, "adequate for what purpose?" Given that the inventory information phraseology in the Ouachita Forest Plan was literally lifted from the 1990 Ozark/Ouachita VMEIS and given the VMEIS's focus on the impact of different vegetation management techniques, it is obvious that "adequate" in essence means "adequate to predict whether the vegetation management techniques called for in the project plan will have an adverse impact on PETS within the project area." Thus, the phrase was never intended to establish an automatic requirement of a head-count or census of all PETS within the project area (or for that matter outside the project area) as a condition of approval of the project. The intent was to give adequate protection to PETS species residing within a given project site.

Turning to the meaning of "inventory information", the parties have pointed out that the word "inventory" can have different meanings. Plaintiffs, while protesting that "the methodology of the inventory is not at issue", suggest in their memorandum in support of their motion for summary judgment in the companion case, *Forest Conservation Conservancy et al. v. Jacobs, et al.*, p. 25, footnote 5, that the correct definition is found in *Merriam–Webster Online Dictionary 2004*, as follows: "Inventory: (2) the quantity of goods or material on hand." Defendants, on the other hand, assert that the correct meaning in the context of this case is "a survey of natural resources" citing *Merriam–Webster's Collegiate Dictionary 616*

(10th ed.1996). [Defs.' Mot. for Summ. J., p. 25, fn. 10].

The Court finds the following definitions in *Webster's Third New International Dictionary:* for "inventory": "(1) an itemized list of current assets: as a) a written list or catalog... b) a list or schedule of raw materials... c) a survey of natural resources; *specif:* an estimate or enumeration of the wildlife (as game animals) of a region.... (2) a detailed study or recapitulation: survey, summary...." (Emphasis in original). *Webster's Third New International Dictionary* 1189 (1986).

Given its context, the Court believes that the use of the word "inventory" in the 1990 Ozark/Ouachita VMEIS and 1990 Ouachita Forest Plan did not mean a head-count or census of PETS species within a given project site; rather, it meant a measurement based on some type of estimating procedure. This conclusion is reinforced by the use of the word "information", which suggests something less than a strict inventory, such as would be used to count commercial goods.

Turning to the language of Amendment 31, the Court does not find significant differences in meaning though the format is different. The amendment discontinues the language "when adequate population inventory information is unavailable, it must be collected when the site has a high potential for occupancy by a threatened, endangered, proposed, or sensitive species." At the same time, however, the amendment continues to require a biological evaluation of how a particular project may affect protected species within the project site. It is implicit that "adequate" information is required for this purpose— that is, adequate to determine whether PETS will be affected. The amendment adds that in certain cases, the analysis of potential effects on PETS may be based on an *assumption* that PETS exist in the project area and in such case no further survey for PETS is required. This type of analysis is sanctioned by Amendment 31 where (1) it is unlikely that a survey would detect the presence of the species; (2) established mitigation procedures are already in effect which will protect any PETS which are present from adverse effects; and (3) the habitat requirements of the species are well known and the actions proposed for the project will have beneficial effects or no adverse effects on PETS or any adverse effects are unlikely to cause the species to be federally listed or to suffer reduced viability.

Amendment 31 spells out what was implicit in the PETS language in Amendment 3 of the 1990 Ouachita Forest Plan. The amendment clarified that "adequate" data would not require actual data where the PETS in question were assumed to be present in the project area and where the project activities would not harm any PETS that were present.

Throughout Plaintiffs' complaint and briefs, Plaintiffs discuss the duty to review and collect data on PETS species as though the collection of data were an end in itself. Quite clearly, the purpose behind the PETS information requirement is to facilitate the protection of PETS species. *Cf. Shenandoah Ecosystems Defense Group v. U.S. Forest Service,* 194 F.3d 1305, 1999 WL 760226, *5 (4th Cir.1999) ("[t]he Forest Service is not required to maintain [PETS] inventories and data to [the plaintiff's] satisfaction, but only as necessary to make the decisions committed to its discretion")(*quoting Krichbaum v. U.S. Forest Service,* 973 F.Supp. 585, 592 (W.D.Va.1997)), aff'd, 139 F.3d 890 (4th Cir.1998). After *Martin,* the Forest Service chose to adopt Amendment 31 not to reduce the Forest Service's duty to protect PETS species, but rather to clarify the timing and circumstances under which additional data should be sought and to

"make the greatest use…of existing data and information." [Am. 31 FONSI, Admin. Rec. IV., tab 5, at p. 3].

It is easy to believe that Defendants never intended for Amendment 3 to the 1990 Ouachita Forest Plan to have the meaning Plaintiffs attribute to it. As a practical matter, Plaintiffs' interpretation would mean that the Forest Service had imposed upon itself an impossible burden to take a literal count of large numbers [18] of highly mobile, elusive species—including fish and tiny species like the American Burying Beetle—as a precursor to approving each and every project within the forest.

Such a requirement would bring Forest Service project planning to a standstill. Until a specific project is proposed within a forest, the contours of the project area are not known. As such, there is little chance that existing species data, even if extensive, would be specific to the proposed project area. Plaintiffs' interpretation of the PETS language in the 1990 VMEIS would therefore force the Forest Service to literally count each of the PETS insects, fish, plants, birds and other vertebrates within project areas of thousands of acres, even where the treatment methods proposed would have no adverse effect on protected species. Such a proposition is not just unreasonable. It is absurd.

An additional claim in Count III is that defendants' finding that Amendment 31 would have "no significant effect on the human environment", thus avoiding NEPA's requirement of the preparation of an environmental impact statement, was arbitrary and capricious. Plaintiffs have made no effort in their briefs to explain why the substitution of Amendment 31 for Amendment 3 would have a significant ef-

fect on the environment. Consistent with the discussion above determining that Amendment 31 was not a significant change to the Ouachita Forest Plan, the Court also finds that defendants' determination that the amendment would have "no significant impact on the human environment" was not arbitrary and capricious.

The nature of the data collection requirements and the environmental impacts of Amendment 31 are issues uniquely within the expertise of the Forest Service; its decisions are not to be overturned lightly. *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). It was not arbitrary and capricious for the Forest Service to amend the original Forest Plan PETS language to state that new data would not be required where the project activities would not adversely affect species present or assumed to be present.

### 3. *Count II*

In Count II, Plaintiffs contend that the approval of Amendment 31 was arbitrary and capricious because the 1990 VMEIS continued to include the old PETS data collection requirement and also stated that "[e]ach forest may be more restrictive, but not less" than the VMEIS as to PETS protection. Based on this language, Plaintiffs argue that Amendment 31's alleged dilution of the PETS data collection requirement in the Ouachita Forest Plan was arbitrary and capricious because it contradicted a non-discretionary requirement still in effect in the 1990 VMEIS, thereby violating NEPA.

Plaintiffs point both to regulations and to cases from other jurisdictions supporting their contention that the Forest Ser-

---

**18.** Because the sensitive species list varies from one Region to another, the total list of PETS for each forest varies. In July 2002 there were 77 PETS species possibly residing in the Ouachita National Forest. Thirteen were Endangered species. The rest were sensitive species designated by the Regional Forester.

vice must implement mandatory mitigation measures appearing in an environmental impact statement. 40 C.F.R. § 1505.3 ("Mitigation... and other conditions established in the environmental impact statement or during its review and committed as part of the decision shall be implemented"); *see also, e.g., Heartwood, Inc. v. U.S. Forest Service,* 230 F.3d 947, 949 (7th Cir. 2000). Defendants counter that NEPA is a procedural statute that can impose no such substantive requirement. Defendants also argue that 40 C.F.R. § 1505.3 is applicable only to mitigation measures adopted as part of a specific project approval and not to generally applicable provisions like those in the VMEIS.

Whether or not Plaintiffs' claim is cognizable under NEPA, the Court has concluded that Amendment 31 did not significantly alter the Forest Service's obligation to protect PETS under the Ouachita Forest Plan. Since there are not important distinctions between the PETS requirements under Amendment 31 and those under the 1990 VMEIS, the failure to amend or supplement the substantially identical language in the 1990 VMEIS before adding Amendment 31 was of no consequence and was not arbitrary or capricious.

### 4. *Count VII*

Plaintiffs assert generally in Count VII of their complaint that the Oliver Branch and Wildhorse Creek projects were unlawful because the Forest Service approved them despite lacking adequate PETS inventory data and adequate Management Indicator Species (MIS) data. The complaint mentions no particular PETS or MIS species for which adequate data was lacking.

In response to Defendants' motion for summary judgment, Plaintiffs filed a brief which did not mention data inadequacies for any PETS or MIS species. In their memorandum in support of their motion

for summary judgment, Plaintiffs asserted that the Oliver Branch project lacked "project area population inventories for Bachman's Sparrow, Diana Fritillary, Kiamichi Shiner or mollusks" and that the Wildhorse Creek project lacked "project area population inventories for Indiana Bat, Eastern Small-footed Bat, Diana Fritillary, Bachman's Sparrow, Rich Mountain Salamander and Rich Mountain Slit Mouthed Snail." [Pls.' Mot. for Summ. J., at p. 24–5]. Having made these assertions, Plaintiffs have provided no explanation or argument as to why the data is deficient as to any of these individual species. They merely point out that the data for each species must be examined separately, and that just because there may be sufficient data on one species, that does not mean that the data is adequate for another species.

Plaintiffs' claim of inadequate monitoring data for MIS is only mentioned in a footnote in Plaintiffs' memorandum in support of its motion for summary judgment as follows: "In addition, Management Indicator species data was not collected as required under *Martin.*" [Pls.' Mot. for Summ. J., p. 25, fn. 3]. No particular MIS species is mentioned.

In the face of Defendants' motion for summary judgment, Plaintiffs' response as to MIS is inadequate. Defendants are entitled to summary judgment on this part of Count VII for that reason alone. It is Plaintiffs' responsibility to point out and describe claimed inadequacies, not to leave such inquiry to the Court's imagination. It is not the Court's responsibility to ferret out the information contained in the massive record on PETS and MIS species for the Ouachita National Forest to determine whether the Forest Plan requirements regarding PETS data were met, and whether regulatory requirements for MIS monitoring were met.

■ The only PETS species which is even mentioned both in Plaintiffs' briefs and in the administrative appeals is the Indiana bat [19] as to the Wildhorse Creek Project only. Therefore, Plaintiffs' NFMA PETS claim will be considered as to this species only.

The 1990 Ouachita Forest Plan considered the possibility that the Indiana bat might be found in the Forest, as follows:

Two species of endangered bats, the Indiana bat (Myotis sodalis) and the gray bat (Myotis grisescens) were previously listed as possibly occurring on Forest. Recent studies on the Forest's bat fauna have been completed in both Arkansas and Oklahoma. These studies included extensive mist netting of riparian areas and examination of known caves and abandoned mining drifts. Neither species was found.

\*   \*   \*   \*   \*   \*

The Indiana bat also uses caves as hibernacula, but examination of caves and abandoned mining drifts did not reveal use by this species which has very narrow microclimate requirements. One specimen discovered hibernating in nearby Pushmataha County, Oklahoma, and reported in 1959, is generally considered a waif. There are no records of the Indiana bat occurring south of the Arkansas River in Arkansas. Data collected in other portions of the state where bats range indicates that the bat does establish maternity colonies within snags located in riparian areas. This is often some distance from hibernating caves, indicating this species should be considered to possibly occur on Forest lands during the maternity period, May–August. Snags used by two maternity colonies in Illinois, were of tree species commonly found in riparian areas of the

Forest in both Arkansas and Oklahoma. Standards and guides for Management Area 9 will adequately protect riparian areas potentially used by this species, should it occur.

[1990 Ouachita Forest Plan, Admin. Rec. III, at IV–41].

The Forest Service's reasoning that the project activities for Wildhorse Creek would have no adverse impact on the bat, assuming it was present in the project site, was extensively laid out in the biological evaluation for this project as follows:

**Evaluated Species Survey Information**

\*   \*   \*   \*   \*   \*

2. Indiana Bat

This species is known to occur within the Choctaw Unit, but is not known to occur within the Kiamichi, Broken Bow, or Tiak Units. This species is not known to occur within the proposed project areas, but suitable habitat exists within the proposed project area.

Glass and Ward (1959) first documented the Indiana bat in Oklahoma in two caves in Adair and Pushmataha Counties. Surveys for the Indiana Bat on the Oklahoma Ranger District began in 1989 with Saugey, et al (1990) finding seven hibernating Indiana Bats within Bear Den Caves at the west end of the Choctaw Unit. These caves have been surveyed several Times since then, with seven Indiana Bats being found in 1991, one being found in 1993, and four in 1995. No Indiana Bats were found during winter surveys of 1997, 1999, and 2000. Summer surveys at Bear Den Caves by Caire (1986) and Clark and Clark (1997) did not find Indiana Bats. Additional summer surveys completed on the Tiak Unit (Clark and Clark,

---

19. Most of the species mentioned in Plaintiffs' administrative appeals were neither PETS nor MIS for the Ouachita National Forest at relevant times. Only the Indiana Bat (PETS) and the Pileated Woodpecker (MIS) were.

1995), Choctaw Unit (Clark and Clark, 1995a), and Broken Bow Unit (Clark and Clark, 1997) did not find Indiana Bats. Caire (1986) did not find any Indiana Bats in his survey of 35 additional locations in Southeast Oklahoma.

No new surveys have been completed for this proposed project because the likelihood of detecting this species in a survey is small. This species is known to use Bear Den Caves during hibernation and is assumed to use the general forest area in that vicinity during spring and fall swarming periods.

\*     \*     \*     \*     \*     \*

## Environmental baseline information

\*     \*     \*     \*     \*     \*

2.   Indiana Bat

The Indiana Bat was listed as endangered in 1967. This is a migratory species with approximately 85% of the known population hibernating in seven caves (U.S. Fish and Wildlife Service, 1992). This species is found primarily in the midwestern and eastern United States. The largest populations are in Arkansas, Indiana, Kentucky, Missouri, and Tennessee. Eastern Oklahoma is at the western limit of its range, with known locations occurring in Adair, Delaware, LeFlore, and Pushmataha Counties.

During the summer months, Indiana Bats typically roost during the day in snags or living trees. Most roost sites are located beneath loose or exfoliating bark or in tree cavities. Preferred roost sites are in trees that are 22 cm (9 inches) or larger in dbh and are located in forested habitat where the degree of overstory canopy cover ranges from 60% to 80% (Romme, et al 1995). In general, the largest available trees with suitable bark characteristics and at least some daily exposure to sunlight are the most likely to be used by Indiana Bats as maternity roosts. The suitability of a

given area as roosting habitat declines slightly as canopy closure increases from 80% to 100%, and also declines as canopy closure falls below 60% (Romme, et al 1995). Indiana Bats also use tree roosts during the autumn months prior to entering hibernation (Kiser and Elliott, 1996) and probably use them in the springtime as well. In addition, groups of adult males have been found roosting by day in summer in some caves that are also used as winter hibernacula.

\*     \*     \*     \*     \*     \*

## Effects analysis

\*     \*     \*     \*     \*     \*

2.   Indiana Bat and Eastern Small-footed Bat

Direct impacts to individuals or small groups of roosting bats may occur when trees are cut that harbor undetected roosts or as a result of the accidental felling of occupied snags, shagbark hickories, or damaged or hollow trees during timber harvest or site preparation. None of the areas proposed for timber harvest are located in hardwood or hardwood/pine forest types, which is the main habitat for these species. Because the timber harvest does not occur in preferred habitat, this would be expected to reduce the impact to any roosting bats.

The likelihood of cutting a tree containing a maternity colony or individual roosting bat is extremely low (U.S. Fish and Wildlife Service, 1999). This is due to the large number of suitable roost trees present on the Oklahoma Ranger District, the rarity of these species within Oklahoma, the wide dispersal of Indiana Bats, Eastern Small-footed Bats, and maternity colonies throughout these species' range, and the fact that there have been no maternity colonies found in Oklahoma.

Indirect effects are possible through removal of living trees or snags which have the potential to serve as roosts for maternity colonies or individual bats. Reduction in the density of mature trees could result in the loss or alteration of summer and prehibernation habitat. Timber harvest could also alter insect species composition and reduce the availability of certain insects causing the bats to search for alternate foraging habitat. Based upon the total amount of available habitat: within the Oklahoma Ranger District, this reduction would be a minimal effect.

Due to the proposed prescribed burning being cool season burns while most bats are hibernating, direct bat mortality due to loss of roost trees would be minimized. Smoke can also be a problem for winter hibernaculums when it is allowed to filter into the cave and disturb the hibernation period. This occurs when the smoke sinks into the hibernaculum. Bear Den Caves is approximately 6–10 miles west of the proposed project area. There would not be expected to be any direct effects to hibernating Indiana Bats or Eastern Small-footed Bats from the proposed prescribed burning (U.S. Fish and Wildlife Service, 1999). Prescribed burning would be expected to be somewhat beneficial through restoring and maintaining uncluttered open foraging pathways for the bats and allow easier access to roost trees.

Indirect effects to these bat species could result from the felling of snags during the prescribed burn itself or from dozer activity pushing over a snag near the fireline. This would cause the snags to be taken away from potential use as roost sites. Additionally, on warmer days in late winter, prescribed burns have the potential to disturb bats from their roost trees. This would cause the bats to fly and use energy they would otherwise be conserving. The possibili-

ty of an Indiana Bat or Eastern Small-footed Bat roosting within an area outside of Bear Den Caves during the cool season is highly unlikely given the biology and known distribution of these species.

The proposed low standard, intermittent service road construction would have no effect on the Indiana Bat or Eastern Small-footed Bat. These bats are not known to rest beneath leaf litter or use the forest floor to where they would be directly impacted through temporary road construction. The proposed intermittent roads would be planned to where trees removed within the proposed roadway would be removed for purposes of the timber sale and not the temporary road construction. Therefore, no additional mature trees beyond what is proposed for removal by the timber sale would occur for the creation of temporary roads.

There would not be any expected cumulative effects from implementation of the proposed project. The proposed project would not provide any long-term negative impacts to these bat species considering their mobility and extremely low population level. There are no known planned actions on private lands that would add to any cumulative effects.

\*     \*     \*     \*     \*     \*

**Determination of Effects:**

\*     \*     \*     \*     \*     \*

As documented in the Indiana Bat Biological Opinion (U.S. Fish and Wildlife Service, 1999), it is my determination that the proposed project is not likely to adversely affect the Indiana bat.

\*     \*     \*     \*     \*     \*

In all cases where new information on threatened, endangered, or sensitive species within the project area is disclosed, appropriate mitigation measures

will immediately be implemented as well as any necessary changes in project proceedings.

[Wildhorse Creek BE, Admin. Rec. I, at 158, 164, 175, 180].

Plaintiffs' obligation is to demonstrate that the Forest Service's reasoning as to the Indiana bat was arbitrary and capricious. The only argument expressly made by Plaintiffs is that Defendants did not conduct a separate "population inventory" of Indiana bats within the Wildhorse Creek project area. By "population inventory", Plaintiffs mean an actual count of bats obtained by a species survey within the population area. However, Amendment 31 sanctioned Defendants' decision not to conduct a species survey because it provided that a survey would not be required where the protected species were assumed to be present for purposes of the effects analysis, and no adverse effect was shown. Plaintiffs also argue that Amendment 31 was invalid; however, the Court has rejected that argument elsewhere in this order.[20]

## II.  *Claims Pertaining to National Forests in Florida and Louisiana*

■■■ In 1999 revised Forest Plans were enacted for the National Forests in Florida. Also, a revised Forest Plan was enacted for the Kisatchie National Forest in Louisiana. The revised Forest Plans [21] are not in the record, but the record does contain the Record of Decision for each revised plan, which is a short summary of the plans' contents. The Records of Decision each indicate that the revised plans were the outgrowth of new environmental impact statements. These environmental impact statements are not in the record, though they are referenced in the Records of Decision.

Plaintiffs argue that the revised Forest Plans and the environmental impact statements for the Florida National Forests and the Kitsachie National Forest in Louisiana are defective because "the language weakening the PETS monitoring requirements did not appear in the draft revised Forest Plans in these two states, nor was it mentioned in the draft EISes accompanying these revisions, nor was it mentioned or discussed in the final EISes accompanying the final revised plans, even though the weakened PETS monitoring requirements appeared in these final revised plans." [Pls.' Mot. for Summ. J., p. 13]. Plaintiffs refer in their brief to Exhibits Z–DD, identified as excerpts of relevant plan revision documents in Louisiana and Florida, but it is unclear whether these documents are in the record.

The Court is unsure how to assess Plaintiffs' argument. It is not obvious why, when Defendants enacted new Forest Plans with new environmental impact statements, the PETS provisions could not be different from those in the 1990 Regional VMEISs. For one thing, the record does not clarify whether the 1990 VMEISs as supplemented continued to exist after the new Forest Plans and environmental impact statements were enacted or whether they were a required point of reference for the new Forest Plans. Finally, the Court cannot, based on the sparse documentation provided, determine whether any differences between the drafts and

---

**20.**  Even if Amendment 3 had been in effect, the decision not to seek additional "inventory information" for the bat was correct, because there was not a "high probability" that the Indiana bat was present in the project area as required by Amendment 3. Rather, there was a "possibility" that the bat would be present.

**21.**  The Court believes these are revised plans required by 16 U.S.C. § 1604(f), which states that each Forest Plan must be revised at least every fifteen years.

final Revised Forest Plans and EISs were the product of improper procedures.

In any event, however, the Court agrees with Defendants that this claim is not ripe for review because it is 'not tied to any specific project as required under *Ohio Forestry* discussed above. Therefore, it must be dismissed without prejudice.

### III. *Claims Pertaining to National Forests in Georgia and Alabama*

In 2000, an amendment was added to the Chattahoochee–Oconee Forest Plan (Amendment 18) and also to the Forest Plan for the National Forests in Alabama (Amendment 17) which were similar to Amendment 31 to the 1990 Ouachita Forest Plan, discussed above. In 2002, amendments were again added to the Chattahoochee–Oconee Forest Plan (Amendment 20) and the Alabama Forest Plan (Amendment 18) which were similar to Amendment 35 to the 1990 Ouachita Forest Plan. The record does not disclose whether any specific projects have been approved since the enactment of these amendments, though Plaintiffs do allude generally in their brief to the pendency of new projects.

In January 2004, revised Forest Plans were adopted for the National Forests in Alabama and also for the Chattahoochee–Oconee National Forest. These revised Forest Plans are not in the record, but the record does contain Records of Decision which summarize the content of the final environmental impact statement and the Revised Forest Plan in each case. [Admin. Rec. V, tabs 1 and 2].

Plaintiffs make the same arguments as to the amendments to the Chattahoochee–Oconee Forest Plan and the Alabama Forest Plan as they did regarding Amendment 31 of the Ouachita Forest Plan, discussed above. While the Court did rule on Plaintiffs' challenges to Amendment 31 on the merits, it cannot do so with respect to the

challenges to the similar amendments to the other plans. Again, these claims are not ripe for review because no claims pertaining to a specific project approved pursuant to the guidelines established by these amendments have been made in this case. Therefore, they must be dismissed without prejudice.

### IV. *Claims Pertaining to the Appalachian Mountains Region and the Coastal Plains/Piedmont Region*

In October 2002 the Forest Service supplemented regional VMEISs for the Appalachian Mountains Region and the Coastal Plains/Piedmont Region in the same manner as it supplemented the 1990 Ozark/Ouachita VMEIS to make it consistent with Amendment 31. Plaintiffs make the same argument as to these VMEIS supplements: that they did not constitute the "hard look" required by NEPA and that they were merely afterthoughts to make the VMEISs consistent with the language of the already adopted Forest Plan amendments regarding PETS data collection.

Here again, Plaintiffs have failed to attach this argument to any specific project which was analyzed after these supplemental EISs became effective. For the same reasons stated in Part I.D above, these claims are not ripe for judicial resolution and must be dismissed without prejudice.

### *CONCLUSION*

In summary, Plaintiffs' Motion for Summary Judgment [# 52] is DENIED and Defendants' Motion for Summary Judgment [# 60] is GRANTED IN PART. Summary Judgment is GRANTED to Defendants with respect to Counts I, II, III and VII pertaining to the Ouachita National Forest. The claims in Counts IV and V are DISMISSED without prejudice. All claims pertaining to the National Forests in Florida, Louisiana (Kisatchie National

Forest), Georgia and Alabama and claims pertaining to the Appalachian Mountains Region and the Coastal Plans/Piedmont Region are also DISMISSED without prejudice.

Plaintiffs have moved to supplement the Administrative Record [# 70] to add documents concerning Amendment 17 to the Georgia forest plans and Amendment 18 to the Alabama forest plans. The motion is unopposed and is GRANTED. Defendants' similar motion to supplement the Administrative Record [# 67] is also GRANTED. The parties' joint motion for oral argument [# 72] is DISMISSED AS MOOT.